# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| ANDRE VALENTINI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-CV-1971 NAB |
| | ) | |
| ANDREW M. SAUL[1], | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Andre Valentini's appeal regarding the denial of disability insurance benefits and supplemental security income under the Social Security Act. The Court has jurisdiction over the subject matter of this action under 42 U.S.C. § 405(g). The parties have consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Doc. 9.] The Court has reviewed the parties' briefs and the entire administrative record, including the transcript and medical evidence. Based on the following, the Court will affirm the Commissioner's decision.

## I.    Issues for Review

Valentini presents two issues for review. First, Valentini asserts that the administrative law judge ("ALJ") developed a residual functional capacity ("RFC") assessment that is not properly supported by medical evidence addressing his abilities to perform work related functions.

---

[1] At the time this case was filed, Nancy A. Berryhill was the Acting Commissioner of Social Security. Andrew M. Saul became the Commissioner of Social Security on June 4, 2019. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Andrew M. Saul for Nancy A. Berryhill in this matter.

Second, Valentini asserts that the ALJ improperly evaluated his pain complaints and its effect on his ability to perform light work. The Commissioner asserts that the ALJ's decision is supported by substantial evidence in the record as a whole and should be affirmed.

## II.     Standard of Review

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A).

The Social Security Administration ("SSA") uses a five-step analysis to determine whether a claimant seeking disability benefits is in fact disabled. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). First, the claimant must not be engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, the claimant must establish that he or she has an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities and meets the durational requirements of the Act. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the appendix of the applicable regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments do not meet or equal a listed impairment, the SSA determines the claimant's residual functional capacity ("RFC") to perform past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Fourth, the claimant must establish that the impairment prevents him or her from doing past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant meets this burden, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs in the national

2

economy.  *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000).  If the claimant satisfied all of the criteria under the five-step evaluation, the ALJ will find the claimant to be disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The standard of review is narrow.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  This Court reviews the decision of the ALJ to determine whether the decision is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g).  Substantial evidence is less than a preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision.  *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir. 1994).  The Court determines whether evidence is substantial by considering evidence that detracts from the Commissioner's decision as well as evidence that supports it.  *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006).  The Court may not reverse just because substantial evidence exists that would support a contrary outcome or because the Court would have decided the case differently.  *Id.*  If, after reviewing the record as a whole, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's finding, the Commissioner's decision must be affirmed.  *Masterson v. Barnhart*, 363 F.3d 731, 736 (8th Cir. 2004).

The Court must affirm the Commissioner's decision so long as it conforms to the law and is supported by substantial evidence on the record as a whole.  *Collins ex rel. Williams v. Barnhart*, 335 F.3d 726, 729 (8th Cir. 2003).  "In this substantial-evidence determination, the entire administrative record is considered but the evidence is not reweighed."  *Byes v. Astrue*, 687 F.3d. 913, 915 (8th Cir. 2012).

### III.     Discussion

**A.     Background**

Valentini completed his applications for disability insurance benefits and supplemental security income on January 17, 2016. (Tr. 203-204, 208-15.) Valentini worked as a construction laborer and driver during his career. (Tr. 81, 84-85, 308). Valentini stopped working due to his condition on January 8, 2016. (Tr. 279-80.) In his disability application, Valentini alleged that the following impairments limited his ability to work  arthritis, shoulder surgery in both shoulders, carpal tunnel syndrome in both hands, a collapsed vertebrae, high blood pressure, and a back injury. (Tr. 279.) Valentini completed an Adult Function Report where he stated that he has "tremendous pain daily." (Tr. 294.) Valentini noted that he has trouble sleeping. (Tr. 294.) He also indicated that his impairments affect lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and using hands. (Tr. 298.) Valentini's fiancée wrote a letter to the ALJ dated March 26, 2018. (Tr. 363.) She stated that she has known him for 10 years and has lived with him for 5 years. She wrote that his injury has dramatically changed his life and she observes him struggling with normal everyday tasks. She gave examples of his inability to complete washing dishes, watching TV, and grocery shopping. She also noted that he does not sleep well, because he has trouble sleeping due to pain. Finally, she states that the lack of sleep "impairs his focus during the day."

The administrative record is substantial; therefore the Court will provide a condensed summary of the record. Valentini injured his shoulder after a fall on February 17, 2014. (Tr. 1431.) A February 20, 2014 MRI indicated moderate tendinopathy of the supraspinatus and infraspinatus tendons of the left shoulder with a full-thickness insertional tear of the anterior

supraspinatus tendon, extensive subacromial/subdeltoid bursitis, and mild acromioclavicular osteoarthritis. (Tr. 1429-30.) Dr. Christopher Rothrock diagnosed Valentini with a full-thickness rotator cuff tear within his left shoulder. (Tr. 1312-15.) On March 4, 2014, Dr. Rothrock performed a left shoulder arthroscopy with an extensive debridement of the glenohumeral joint, a subacromial decompression and acromioplasty, and a mini open rotator cuff repair of a massive rotator cuff tear. (Tr. 365-66, 1291.) Valentini successfully completed physical therapy for his shoulder in October 2014. (Tr. 1405-1407.) At the time of discharge, Valentini reported continued pain in his left shoulder especially with overhead activities and load handling. (Tr. 1406.) He described the pain as intermittent and sharp with a pain level of 3 to 6 out of 10. (Tr. 1406.) He reported that the pain increases with anything overhead, reaching out to his side, and sleeping on his left side. (Tr. 1406.) Dr. Rothrock opined in October 2014 that Valentini had reached the point of maximal medical improvement and could be working full duty without any limitations. (Tr. 1291.) At the time, Valentini was doing heavy manual work as part of his job duties. (Tr. 1405.)

Valentini injured his back at work on January 8, 2016. (Tr. 455-57.) Valentini reported that he was moving supplies in patients' homes and strained his back while moving boxes with a dolly up a set of stairs. (Tr. 455.) Dr. Scott Jones observed that Valentini had a marked increase tone to palpation of mid thoracic down through the lumbar paravertebral muscles. (Tr. 456.) His straight leg raise was normal on the left and right. (Tr. 456.) Dr. Jones diagnosed Valentini with thoracolumbar back pain, prescribed ibuprofen, and referred Valentini to physical therapy. (Tr. 456.) Dr. Jones allowed Valentini to return to work with the following restrictions: lift up to 10 pounds occasionally, push and pull up to 20 pounds occasionally change positions periodically to relieve discomfort, walking and standing as tolerated, and no climbing stairs or ladders. (Tr. 457.) Valentini did not return to work.

Valentini began physical therapy two days later. (Tr. 446-47.) An x-ray of the lumbar spine on January 12, 2016 indicated mild degenerative levoscollosis its apex at L3, mild diffuse spondylotic changes, and no acute bony pathology seen. (Tr. 429.) A January 28, 2016 MRI of the lumbar spine showed early desiccation at L4-5 and L5-S1 level; grade-1 retrolisthesis of L4 over L5; focal central protrusion effacing the thecal sac at L4-L5; compromised spinal canal; disc material and facet hypertrophy causing bilateral neuroforaminal narrowing that effaces the left and right L4 exiting nerve roots, more on the left side than right; diffuse disc protrusion without effacement of the thecal sac at L5-S1; and disc material and facet hypertrophy causing bilateral neuroforaminal narrowing that effaces the left and right L5 exiting nerve roots. (Tr. 473.)

Valentini received a left lumbosacral trigger point injection on February 2, 2016 from Dr. Andrew Wayne. (Tr. 1128-29.) Valentini reported that the injection only helped for a day or two. (Tr. 1130.) Valentini began aquatic therapy February 8, 2016. (Tr. 1142-43.) He attended four sessions. (Tr. 1146-62.) At discharge, Valentini reported no improvement of his symptoms, asserting that he had lower back pain that radiated into his left buttock and down to his left leg to his toes. (Tr. 1162.) He reported increased pain while performing aquatic exercise, but attempted all of the exercises asked of him. (Tr. 1162.) His return to work goal was not met. (Tr. 1162.) Dr. Wayne gave him a 5 pound lifting restriction with periodically alternating between sitting and standing. (Tr. 1130.) Dr. Wayne stated he believed that Valentini could use his employer's air ride truck. (Tr. 1131.) Valentini stated that his truck was not an air ride truck and the air ride trucks bounce a lot and would bother his back. (Tr. 1132.) Dr. Wayne noted that Valentini had positive straight leg raises. (Tr. 1126, 1128, 1130, 1134.) A lumbar ESI performed on February 25, 2016 showed status post left lumbo sacaral sprain/strain injury with MRI evidence of a broad based degenerative disc protrusion at L4-5, with left more so than right foraminal stenosis, along

6

with a degenerative broad based disc protrusion at L5-S1.  (Tr. 1132.)  Dr. Wayne then referred him to a spine specialist.  (Tr. 1135.)

Valentini began treatment with Dr. Kevin Rutz, an orthopedic surgeon in March 2016.  (Tr. 965-67.)  Dr. Rutz believed that Valentini's January 28, 2016 MRI was of moderate to poor quality and therefore ordered a myelogram of the lumbar spine.  (Tr. 966.)  The April 4, 2016 myelogram indicated mild disc desiccation with diffuse annular bulge at L4-L5 level.  (Tr. 1164-65.)  There was not central stenosis or lateral recess stenosis.  (Tr. 1164.)  There was minimal bilateral neural foraminal exit stenosis.  (Tr. 1164.)  At the L5-S1 level, there was mild disc desiccations with diffuse annular disc bulge without central canal stenosis or lateral recess stenosis.  (Tr. 1164.)  There was mild neural foraminal exit stenosis at L5-S1.  (Tr. 1165.)  Dr. Rutz performed a left L5-S1 microdisectomy on April 22, 2016.  (Tr. 479-91.)

Post-surgery, Dr. Rutz noted that Valentini's symptoms had improved, but not as much as expected, so Dr. Rutz ordered physical therapy on May 31, 2016.  (Tr. 974.)  Valentini attended physical therapy between June 6, 2016 and July 18, 2016.  (Tr. 1217-18, 1220-33.)  During his treatment, Valentini reported no improvement in his radiating left leg pain and only temporary reduction of his lower back pain.  (Tr. 1224.)  The physical therapist noted that Valentini objectively exhibited improved lumbar mobility in both flexion and extension with decreased muscle spasm at the lower back.  (Tr. 1224.)  At the end of his physical therapy, Valentini reported no improvement in pain complaints but reported improved mobility.  (Tr. 1218.)  He also demonstrated improved trunk and lower extremity flexibility in objective testing.  (Tr. 1218.) Valentini received a new MRI on June 29, 2016, which demonstrated no recurrent disc herniation at L5-S1, disc desiccation from L4 to S1, and a small central disc herniation at L4-5.  (Tr. 976.) Valentini received a lumbar transforaminal epidural steroid injection (ESI) on July 12, 2016.  (Tr.

7

977, 1166.) Valentini expressed that he did not receive any benefit from the ESI and the numbness in his left leg was worsening. (Tr. 978.) He reported that pain increased with any increase in activity levels and prolonged sitting in a single position. (Tr. 978.) A discogram was performed on August 2, 2016. (Tr. 1167.) The discogram indicated extensive circumferential Dallas Gr. IV internal annular tearing with expansion of the nuclear cavity at L4-L5. (Tr. 1167.) The discogram at L5-S1 showed extensive circumferential annular tearing and fissuring with minimal contrast extravasation into the ventral epidural space. (Tr. 1168.)

     Dr. Rutz performed a L5-S1 revision decompression and L4-5 laminotomy; L4-L5 transforaminal lumbar interbody fusion with placement of prosthetic interbody vertebral devices, and posterior pedicle screw instrumentation at L4 to S1 on August 26, 2016. (Tr. 883-917.) An x-ray performed on September 13, 2016 indicated hardware and grafting from L4 to S1 to be in good position without signs of loosening. (Tr. 982-83.) Dr. Rutz noted that Valentini was improving as expected until December 2016, when Dr. Rutz noted that he had not improved as expected 3 ½ months post-decompression and fusion. (Tr. 982-99.)

     A January 3, 2017 lumbar spine myelogram indicated decompression and instrumentation at L4-5 and L5-S1 without residual central canal or lateral recess stenosis. (Tr. 1169.) A CT of the lumbar spine on the same date indicated decompression and instrumentation at L4-L5 and L5-S1 with solid appearing fusion at L4-L5 but delayed or failed fusion at L5-S1 with probable left sided S1 screw loosening. (Tr. 1170.) There was also mild residual bilateral L5-S1 and right L4-L5 foraminal stenoses due to bulging annular material. (Tr. 1170.) In a letter dated January 11, 2017, Dr. Rutz stated that he spoke to Dr. Matthew Ruyle the radiologist who performed the CT scan regarding the loosening of the S1 screw and delayed union at L5-S1. (Tr. 622.) According to Dr. Rutz's letter, Dr. Ruyle's opinion was "the screw might have loosened a little but he believes

8

that the patient appears to still be going on to solid fusion." (Tr. 622.) Dr. Rutz then opined that he still believed that the fusion is most likely solid, because he did not see any classic signs of nonunion." (Tr. 622.) Dr. Rutz again ordered physical therapy. (Tr. 990.)

Valentini attended physical therapy from January 5, 2017 to February 6, 2017. (Tr. 656-58.) Physical therapist J. Adlon noted that Valentini reported no improvement in his back or left lower extremity pain. (Tr. 657.) Adlon wrote that objectively Valentini demonstrated decreased trunk and lower extremity flexibility with slight weakness in the left lower extremity. (Tr. 657.) Valentini did not meet his therapy goals to decrease pain level by 2 levels, assess functional capabilities, or improve posture, tolerance to sitting, and transitional mobility. Valentini improved his lower left extremity flexibility and strength to 5/5. (Tr. 657.) There was minimal change in lumbar mobility. (Tr. 657)

On April 8, 2017, Dr. Rutz examined Valentini who continued to complain of back pain with radiation to his left buttock and down his left leg. (Tr. 775.) Valentini also complained that he felt something loose in his lower back. (Tr. 775.) A CT myelogram of the lumbar spine showed that there was solid fusion from L5 to S1 and no signs of neurologic impingement. (Tr. 775.) Dr. Rutz then ordered a selective left S1 nerve root block for diagnostic and therapeutic purposes. (Tr. 775.)

A selective left S1 nerve root block was given on May 30, 2017. (Tr. 1001, 1174.) On June 13, 2020, Valentini reported that this aggravated his symptoms for 1-2 days, provided relief for 1-2 days, and then his symptoms returned to baseline. (Tr. 1001). A June 27, 2017 MRI indicated no pathology above his lumbar fusion and his lumbar fusion appeared to be intact. (Tr. 638, 782-83, 857-58.) There was normal postoperative scarring. (Tr. 638.) At that time, Dr. Rutz told Valentini that he could live with the pain he has or consider surgical exploration. (Tr. 638.)

9

Although Valentini wanted to have the exploratory surgery, he lost his insurance and could no longer afford treatment. (Tr. 69-71.)

Dr. Daniel Kitchens performed an Independent Medical Examination on October 13, 2017. (Tr. 499-514.) Dr. Kitchens also reviewed Valentini's medical history and prepared a report. Dr. Kitchens described Valentini's symptoms as unremarkable. (Tr. 500.) Dr. Kitchens stated that Valentini's motor examination indicated 5/5 strength in deltoids, biceps, triceps, grips, iliopsoas, hamstrings, dorsiflexors, plantarflexors, and extensor hallucis longus. (Tr. 501.) Valentini's gait was steady and his tandem gait was normal. (Tr. 501.) His reflexes were 1 and symmetric at bicep, triceps, wrists, patella, and Achilles. (Tr. 501.) Dr. Kitchens observed a well-healed lumbar incision without evidence of redness, swelling, or drainage. (Tr. 501.) Valentini reported discomfort with flexion and extension of the lumbar spine and with simple touching of his lower back. (Tr. 501.) Dr. Kitchens opined that Valentini's positive Hoover's sign with testing of left lower extremity strength in the supine position was suggestive of malingering. (Tr. 501.) Valentini reported no pain with straight leg raising in the sitting position. (Tr. 501.) Dr. Kitchens opined that Valentini's report of pain in his lower back and left buttock with raising his left leg approximately 10 degrees was inconsistent and was suggestive of symptom magnification and malingering. (Tr. 501.) Dr. Kitchens further opined that he did not see evidence of an acute injury as a result of the January 8, 2016 work incident and Valentini did not require additional treatment. (Tr. 514.) Dr. Kitchens found no objective evidence of a lumbar radiculopathy. (Tr. 514.) Dr. Kitchens wrote that Valentini's examination was inconsistent and remarkable for signs of malingering and symptom magnification. (Tr. 514.)

Physical Therapist J. Adlon performed a functional capacity evaluation ("FCE") for Valentini on November 2, 2017. (Tr. 1007-15.) Adlon observed that Valentini's posture indicated

a weight shift to the right, slight left lateral shift, forward trunk flexion with decreased lumbar lordosis. (Tr. 1009.) Although postural deviations persisted, Valentini exhibited a normal heel to toe pattern. (Tr. 1009.) There was moderate tenderness along the lumbar paraspinals without spasm and left sciatic notch tenderness. (Tr. 1009.) His bilateral Achilles and Quadricep reflexes were 2+. (Tr. 1009). Valentini's active range of motion for his upper extremities was within functional limits without complaint. (Tr. 1009.) Upper Extremity strength is 5/5 through the major muscle groups with complaints of slight lower back pain upon manual muscle testing. (Tr. 1009.) There was decreased flexibility through the bilateral hips with complaint of lower back pain upon knee to chest and hip extension. (Tr. 1009.) Valentini exhibited left hip strength 4+/5 with the exception of 4/5 hip flexion and extension, left knee strength 4+/5, left ankle and extensor hallucis longus tendon strength 5/5- all with complaints of lower back pain. Cervical spine active range of motion was within functional limits without complaint. (Tr. 1009.) Lumbar rotation was mildly decreased with minimal complaint. (Tr. 1010.) Valentini reported pain across the low back upon flexion, tightness upon lateral flexion, burning pain from the left buttock to posterior knee upon left straight leg raise, hamstring pulling upon right straight leg raise, and midback pain upon extension. (Tr. 1010.) The Waddell's Signs were negative. (Tr. 1009, 1015.) Adlon determined that Valentini provided an overall good effort and the FCE was an accurate assessment of his current functional capabilities. (Tr. 1009.) Adlon concluded that Valentini demonstrated the ability to perform within the light to medium work demand level regarding load handling with consideration given to limited tolerance to squatting, walking, and standing. (Tr. 1009.)

After reviewing the FCE, Dr. Kitchens modified his opinion on November 16, 2017, to state that he believed that Valentini could return to work in the light to medium duty category with permanent restrictions in that category. (Tr. 515.) Dr. Rutz reviewed Dr. Kitchen's October 13,

2017 examination opinion, the FCE, and Dr. Kitchen's November 16, 2017 letter. (Tr. 1005-1006.) Dr. Rutz expressed disagreement with Dr. Kitchen's October 2017 opinion that Valentini did not suffer an acute injury from the January 8, 2016 incident and had a 0% impairment rating related to the incident. (Tr. 1005-1006.) Dr. Rutz agreed that Valentini would have permanent restrictions. (Tr. 1005.)

The ALJ gave no weight to Dr. Kitchens' October 13, 2017 letter. (Tr. 27.) The ALJ found that Valentini had a history of back impairments with two surgeries, and the evidence certainly showed some limitations in range of motion and left lower extremity strength. (Tr. 27.) The ALJ gave great weight to Dr. Kitchens' November 16, 2017 letter stating that Valentini could perform light to medium work with permanent restrictions at that level. (Tr. 27.) The ALJ gave great weight to Dr. Rutz's opinions because he was an orthopedic surgeon who provided extensive treatment to Valentini and he had personal experience with the objective findings. (Tr. 27.) The ALJ gave great weight to the FCE performed by J. Adlon, because he specifically examined Valentini to consider the ability to perform work activities and his opinions were consistent with the medical evidence as a whole. (Tr. 26.)

**B.     RFC Determination**

Valentini asserts that the RFC is not supported by substantial evidence, because the FCE did not support a finding he could do light work or contain an explanation of the methods of data extrapolation. Further, Valentini asserts that the ALJ should not have given great weight to the FCE, because its conclusions he can do light work contradict its findings that he has limited tolerance for standing, walking, and squatting. Valentini also contends that the ALJ did not properly evaluate the effect of pain on the RFC determination.

The RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis.[2] SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his limitations. *Pearsall*, 274 F.3d at 1217. An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. *See Cox*, 471 F.3d at 907. It is the claimant's burden to establish his RFC. *Masterson,* 363 F.3d at 737. "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). There is no requirement, however, that an RFC finding be supported by a specific medical opinion. *Hensley*, 829 F.3d at 932.

The ALJ found that Valentini had the severe impairments of status post rotator cuff repair, degenerative disc disease status post discectomy and lumbar fusion, and obesity. (Tr. 19.) He determined that Valentini did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20.) The ALJ found that Valentini had the RFC to perform light work with the following additional limitations: occasionally reach overhead, frequently reach in all directions with the left upper extremity, alternate sitting to standing every 15 minutes while remaining on task at the work station, occasionally climb ramps and stairs, balance, stoop, kneel crouch, and

---

[2] A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. SSR 96-8p, 1996 WL 374184, at *1.

crawl, never climb ladders, ropes, or scaffolds, never work at unprotected heights or near moving mechanical parts, and occasionally tolerate extreme cold and vibration.  (Tr. 21.)

### 1. Functional Capacity Evaluation

First, Plaintiff states that the ALJ erred by giving great weight to the FCE, because it was written by a physical therapist, who is not an acceptable medical source.

> Social Security separates information sources into two main groups: *acceptable medical sources* and *other sources.*  It then divides *other sources* into two groups: *medical sources* and *non-medical sources.  Acceptable medical sources* include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists.  According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, (2) only acceptable medical sources can provide medical opinions, and (3) only acceptable medical sources can be considered treating sources,

*Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (emphasis in original) (internal citations omitted).  Medical sources include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists." 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)[3]. "Information from these other sources cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose."  SSR 06-03P, 2006 WL 2329939.  "[I]nformation from such other sources, [however], may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.  *Id.*; 20 C.F.R. §§ 404.1513(d), 416.913(d).

---

[3] Several Social Security regulations were changed effective March 27, 2017.  The Court will use the regulations effective at the time that this claim was filed.

14

The FCE should be considered when determining the severity of Valentini's impairments and how they affect his ability to function. *See* 20 C.F.R. §§ 404.1513(d), 416.913(d). The FCE provided the most detailed information in the record regarding Valentini's functional abilities. Valentini does not assert that the FCE findings were invalid. Valentini's complaint appears to be that the ALJ and the doctors improperly relied on the FCE to support the ALJ's finding that Valentini can do light work. Valentini also contends that the FCE did not address whether he could perform light work for eight hours a day and it only addressed his abilities regarding load handling. The ALJ, however, did not solely rely upon the FCE to formulate the RFC or give controlling weight to the FCE. The ALJ relied upon the FCE, the endorsement of the FCE by Drs. Rutz and Kitchens, Valentini's testimony, and the objective medical evidence in the record. The Court also notes that the physical therapist who prepared the FCE was Valentini's physical therapist after his April 2016 surgery. (Tr. 1217-18, 1220-33.) Further, the RFC is more limited than the FCE, because it limits Valentini to light work with additional restrictions.

Valentini also asserts that the ALJ should not have given great weight to the opinions of Dr. Kitchen and Dr. Rutz, because they relied upon the FCE. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, and what the claimant can still do despite her impairments and her physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). All medical opinions, whether by treating or consultative examiners are weighed based on (1) whether the provider examined the claimant; (2) whether the provider is a treating source; (3) length of treatment relationship and frequency of examination, including nature and extent of the treatment relationship; (4) supportability of opinion with medical signs, laboratory findings, and explanation;

15

(5) consistency with the record as a whole; (6) specialization; and (7) other factors which tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c), 416.927(c).

Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it.  *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).  A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as [a] whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007).  A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  "Good reasons for assigning lesser weight to the opinion of a treating source exist where the treating physician's opinions themselves are inconsistent or where other medical assessments are supported by better or more thorough evidence."  *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) (internal citations omitted).

The Court finds that the ALJ did not err in giving great weight to the doctors' opinions. Their opinions were consistent with the objective medical evidence and the treatment records.  Dr. Rutz was a treating specialist who had performed Valentini's back surgeries and treated him for over a year.  Both doctors examined Valentini before the FCE was performed.  Both doctors were familiar with Valentini's medical history and had examined him.  Therefore, the ALJ's decision to assign great weight to the doctors' opinions was supported by substantial evidence.

### 2. **Support in the Record for Limitations in the RFC**

Next, Valentini alleges that the ALJ failed to explain the limitations given in the RFC, including limitations related to his shoulder impairment and ability to sit, stand, and walk.  The court reviews "the record to ensure that an ALJ does not disregard evidence or ignore potential limitations, but [it is not required for] an ALJ to mechanically list and reject every possible

16

limitation." *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011). As stated above, the RFC is not based solely on medical evidence. It is based on all of the evidence in the record, including the claimant's own testimony at the administrative hearing. *Pearsall*, 274 F.3d at 1217. Valentini complains that the ALJ had no medical evidence to support the limitations even though the ALJ cited Valentini's testimony and the medical record in explaining the RFC limitations. *See Dixon v. Berryhill*, No. 4:15-CV-1597 NAB, 2018 WL 1535472 at *3 (E.D. Mo. Mar. 29, 2018) (ALJ could rely on claimant's testimony to form RFC determination). For example, the ALJ included the option to change positions every 15 minutes based on Valentini's testimony that he needed to change positions, which addresses sitting and standing. (Tr. 27, 73, 76.) The ALJ addressed Valentini's shoulder impairment with limitations on reaching and the amount of weight he could carry. The ALJ is not required to cite to every piece of evidence in the medical record. *Hensley*, 829 F.3d at 932 (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). The ALJ is also allowed to make reasonable inferences from the medical record. The ALJ's RFC determination was supported by substantial evidence in the record.

### 3. Pain Evaluation

Finally, Valentini states that ALJ erred in evaluating his pain and its effect on his ability to perform light work. In considering subjective complaints, the ALJ must fully consider all of the evidence presented, including the claimant's prior work record, and observations by third parties and treating examining physicians relating to such matters as:

(1) The claimant's daily activities;

(2) The subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) Any precipitating or aggravating factors;

17

>   (4) The dosage, effectiveness, and side effects of any medication; and
>
>   (5) The claimant's functional restrictions.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). It is not enough that the record contains inconsistencies; the ALJ is required to specifically express that he or she considered all of the evidence. *Id.* The ALJ, however, "need not explicitly discuss each *Polaski* factor." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. *Id.* Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988). "While the extent of daily living activities does not alone show an ability to work, such activities may be considered along with other evidence when evaluating a claimant's credibility." *Walker v. Colvin*, 124 F.Supp.3d 918, 936 (E.D. Mo. 2015).

"Although evidence of pain suffered by a claimant may be of necessity subjective in nature, and therefore difficult to evaluate, the [ALJ] must give serious consideration to such evidence even though it is not fully corroborated by objective examinations and tests performed on the claimant." *Northcutt v. Califano*, 581 F.2d 164, 166 (8th Cir. 1978). "Whether or not a medical explanation for the pain can be given, it is nevertheless possible that the claimant is suffering from disabling pain." *Layton v. Heckler*, 726 F.2d 440, 442 (8th Cir. 1984). "As is true in many disability cases, there is no doubt that the claimant is experiencing pain." *Perkins v. Astrue*, 648 F.3d 892, 901 (8th Cir. 2011). "While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability." *Perkins*, 648 F.3d at 900.

In this case, the ALJ largely credited Valentini's pain complaints. The ALJ noted Valentini's complaints regarding shoulder and back pain throughout the opinion. The ALJ gave

18

no weight to Dr. Kitchens initial opinion and did not find that Dr. Kitchens' opinion of symptom magnification credible. The ALJ restricted Valentini to light work with several additional postural, manipulative, and environmental limitations. The Court finds that the ALJ's credibility assessment is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief requested in Plaintiff's Complaint and Brief in Support of Complaint is **DENIED**. [Docs. 1, 21.]

**IT IS FURTHER ORDERED** that the Court will enter a judgment in favor of the Commissioner affirming the decision of the administrative law judge.

**IT IS FURTHER ORDERED** that the Clerk of Court shall substitute Andrew M. Saul for Nancy A. Berryhill in the court record of this case.

NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of July, 2020.